GIBSON, DUNN & CRUTCHER LLP
Wayne Barsky, SBN 116731
  *wbarsky@gibsondunn.com*
Jason Lo, SBN 219030
  *jlo@gibsondunn.com*
Ellen Lin, SBN 251045
  *elin@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Attorneys for Defendant
Electronic Arts Inc.

**REDACTED VERSION OF DOCUMENT(S)
SOUGHT TO BE SEALED**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GAMETEK LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>ELECTRONIC ARTS INC.,<br><br>                    Defendant. | Case No. C 13-03472 RS DR<br><br>**DEFENDANT ELECTRONIC ARTS'
MOTION FOR ATTORNEY FEES**<br><br>Hearing Date: August 7, 2014<br><br>Hearing Time: 1:30 pm<br><br>Courtroom: 3, 17th Floor, 450 Golden
Gate Avenue, San Francisco, CA<br><br>Name of Judge: Hon. Richard Seeborg |

Gibson, Dunn &
Crutcher LLP

1

## **NOTICE OF MOTION AND MOTION**

2       PLEASE TAKE NOTICE that on August 7, 2014 at 1:30 pm in the courtroom of the

3   Honorable Richard Seeborg, Courtroom 3, 17th Floor, U.S. Courthouse, 450 Golden Gate Avenue,

4   San Francisco, CA, Defendant Electronic Arts Inc. will and does hereby move the Court for an award

5   of attorney fees, including nontaxable expenses and interest.

6       This motion is made pursuant to 35 U.S.C. § 285 because this case is "exceptional" as defined

7   under the statute.  GT Gaming f/k/a Gametek LLC asserted a patent that this Court held to be invalid

8   in one of the "rare" instances of dismissal at the pleading stage for lack of patentable subject matter.

9   *See Gametek LLC v. Electronic Arts Inc.*, No. 13-3472 (N.D. Cal. Apr. 25, 2014) (Dkt. Nos. 89-90).

10  Not only did GT's case have no strength, GT litigated this case in an unreasonable manner in an

11  effort to drive up litigation costs for Defendants and force settlement on a low-quality (invalid)

12  patent.  For example, GT (1) committed misjoinder by including almost two dozen defendants in a

13  single lawsuit, contrary to statute, *see Gametek LLC v. Facebook, Inc.*, No. 12-501 (S.D. Cal. Dec. 7,

14  2012) (Dkt. No. 167) (granting Defendants' motion to dismiss under 35 U.S.C. § 299); (2) re-filed

15  suit against all Defendants again in the same venue, thus requiring Defendants to file multiple

16  (successful) motions to transfer, *see, e.g.*, *Gametek LLC v. Electronic Arts*, No. 12-2927 (S.D. Cal.

17  July 23, 2013) (Dkt. No. 59) (granting Defendants' motion to transfer venue to the Northern District

18  of California), *Gametek LLC v. Zynga Inc.*, No. 12-2933 (S.D. Cal. June 3, 2013) (Dkt. No. 42-1)

19  (same); (3) filed a motion to compel discovery based on, as the court found, a "fairly significant

20  misrepresentation," *see Gametek LLC v. Zynga Inc.*, No. 13-2546 (N.D. Cal. Nov. 22, 2013) (Dkt.

21  No. 63) (denying GT's motion to compel discovery), *and* Transcript of Hearing at 4, *Gametek LLC v.*

22  *Zynga Inc.*, No. 13-2546 (N.D. Cal. Oct. 21, 2013) (Dkt. No. 92); and (4) repeatedly demanded

23  unreasonable discovery, even after the Court made a tentative ruling invalidating the patent.  This

24  motion is based on this Notice of Motion and Motion for Attorney Fees, the attached Memorandum

25  of Points and Authorities, the Declaration of Jason Lo and exhibits thereto, and any other evidence or

26  argument presented by counsel to the Court.  A proposed order is included.

27

28

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2

Pages

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF THE ISSUE TO BE DECIDED ............................................... 3

III.  STATEMENT OF THE JUDGMENT, STATUTE ENTITLING EA TO THE
      AWARD, AND THE AMOUNT SOUGHT ........................................................... 3

IV.   BACKGROUND FACTS ........................................................................................ 3

V.    LEGAL STANDARD ............................................................................................. 6

VI.   ARGUMENT ........................................................................................................... 9

      1.    EA is the Prevailing Party .......................................................................... 9

      2.    This is an Exceptional Case Under 35 U.S.C. § 285 .................................. 9

            a.    GT's assertion of the validity of the '445 patent lacked substantive
                  strength, as shown by this Court invalidating the patent at the
                  pleading stage, a rare occurrence that satisfies the "exceptional
                  case" standard ............................................................................... 10

            b.    GT litigated this case in an unreasonable and oppressive manner,
                  providing another ground for an exceptional case finding ............................. 10

                  1)    GT violated the joinder statute, and the court granted EA's
                        motion to dismiss for misjoinder ......................................... 11

                  2)    GT re-filed suit in the same venue, and the court not long
                        after granted EA's motion to transfer venue .................................... 12

                  3)    In at least twenty-five different instances, GT threatened
                        motions to compel and sanctions for alleged discovery
                        violations despite the lack of any discovery deadline, and
                        the court denied GT's motion to compel discovery ........................... 13

VII.  CONCLUSION ...................................................................................................... 16

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

Pages

3

## Cases

4

*Alice Corporation Pty. v. CLS Bank International,*
    No. 13-298 (June 19, 2014) .................................................................... 10

5

*Lumen View Technology v. Findthebest.com,*
    No. 13-3599, 2014 WL 2440867 (May 30, 2014) ......................................... 8

6

*Network Protection Services v. Fortinet,*
    No. 12-1106, 2013 WL 4479336 (N.D.Cal. 2013) ....................................... 8

7

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.,*
    572 U.S. __, No. 12-1184 (Apr. 29, 2014) ................................... 1, 6, 7, 10

8

*Ultramercial, Inc. v. Hulu,*
    722 F.3d 1335 (Fed. Cir. 2013) ......................................... 1, 5, 10

9

10

## Statutes

11

35 U.S.C. § 101 ......................................................................................... 5, 8

12

35 U.S.C. § 285 ......................................................................................... 1, 3, 6

13

35 U.S.C. § 299 ......................................................................................... 4, 11

14

## Other Authorities

15

American Intellectual Property Law Association, *Report of the Economic Survey 2013* .................... 6

16

Federal Circuit Chief Judge Randall R. Rader, Colleen V. Chien, and David Hricik,
    *Make Patent Trolls Pay in Court*, The New York Times (June 4, 2013)............................ 3, 7, 16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1    **I.      INTRODUCTION**

2           On April 25, 2014, this Court granted judgment on the pleadings in favor of Defendant

3    Electronic Arts Inc. ("EA") because Plaintiff GT Gaming f/k/a Gametek LLC's asserted patent is

4    invalid for lack of patentable subject matter.  As the prevailing party, EA seeks attorney fees allowed

5    by the patent statute for an "exceptional case."  *See* 35 U.S.C. § 285.

6           Recently, the Supreme Court removed the constraints the Federal Circuit had imposed on

7    district courts' discretion to award § 285 attorney fees and explained that a wider universe of

8    scenarios would fall under the statute's definition of "exceptional."  In particular, the Supreme Court

9    identified two types of cases that would each satisfy the § 285 standard: (1) "one that stands out from

10   others with respect to the substantive strength of a party's litigation position (considering both the

11   governing law and the facts of the case)" or (2) "the unreasonable manner in which the case was

12   litigated."  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (Apr. 29,

13   2014).  The Supreme Court held that "exceptional" in the statute has its ordinary meaning: "rare."  *Id.*

14   Nothing else constrains district courts from awarding fees under § 285.  *Id.*

15          The standard is satisfied here for two independent reasons.  ***First***, the lack of substantive

16   strength of GT's assertion of Patent No. 7,076,445 is shown by this Court's Order invalidating the

17   patent at the pleading stage for lack of patentable subject matter.  Both this Court and the Federal

18   Circuit have noted that such dismissals are warranted only in "rare" cases.  *See Gametek LLC v.*

19   *Electronic Arts Inc.*, No. 13-3472, at *4 (N.D. Cal. Apr. 25, 2014) (Dkt. No. 89) (quoting

20   *Ultramercial, Inc. v. Hulu*, 722 F.3d 1335 (Fed. Cir. 2013)).  Further, as the Court recognized, GT

21   provided "no meaningful alternative," "no substantive counter-argument," and "no explanation" on

22   the § 101 inquiry in response to EA's motion.  *Id.* at *6, 7, 9, 10.

23          ***Second***, this case is also exceptional because, in a thinly veiled attempt to force a nuisance

24   settlement, GT's improper litigation demands drove up EA's costs in defending the litigation.  GT is

25   a non-practicing entity and subsidiary of the massive patent assertion entity Acacia.  As evidenced by

26   its litigation conduct, GT's business plan from the start was to purchase a low value (really, no value)

27   patent at a cheap price, assert that patent against a slew of productive companies spanning an entire

28   industry, and drive up litigation costs to extract settlements individually lower than the cost of each

defendant defending litigation but in the aggregate more than GT's cost to purchase the patent in the first place.   And, the strategy worked.   By the time the patent was ruled invalid, GT had already extracted individual settlements at well below the average cost of defense from ten of the fourteen[1] defendant companies it sued for an aggregate amount that far exceeds what it paid for the now-invalid patent.

GT's attempts to litigate irrespective of the merits of its case and to escalate litigation costs to EA were replete throughout this litigation: committing blatant misjoinder; re-filing its suit against the same defendants in the same improper venue thus forcing each to move for transfer; filing a motion to compel discovery based on, as the Judge found, a "fairly significant misrepresentation" to the court; and, even after being chastised by the court, continuing to threaten (without basis) to compel discovery more than a dozen times.

Perhaps no better example of GT's improper litigation strategy is its actions after this Court made its tentative ruling on the merits against GT at the hearing on EA's motion for judgment on the pleadings.   Remarkably, with a likely dispositive ruling against it and no discovery deadline set, GT *increased* its demands for discovery.   The morning after the hearing, GT's counsel demanded depositions of EA witnesses on seventy-four Rule 30(b)(6) topics on nine accused products in a short time span.   Likewise, GT's counsel wanted to depose Zynga witnesses on seventy-three Rule 30(b)(6) topics on twenty accused products on an expedited basis (within the next three weeks) and attempted to add an entirely new accused product to the case.

There is simply no rational explanation for GT's discovery demands other than that it was one last effort to force settlement discussions by threatening to impose on Defendants substantial litigation costs before the Court invalidated the patent.   While egregious, GT's actions are not surprising, as GT's strategy was never based on the strength of the '445 patent.

Because GT's actions throughout the litigation forced EA to incur unnecessary costs and attorney fees, EA seeks reimbursement in defending against a lawsuit that had no substantive strength

---

[1] This number combines related entities, excludes companies GT voluntarily dismissed, and includes companies sued outside of the original misjoined case.

Gibson, Dunn &
Crutcher LLP

and was fraught with GT's unreasonable litigation demands to drive up EA's litigation costs in hopes of forcing EA to settle rather than bear the cost of litigation. GT should not be rewarded (as it has already leveraged several settlement payments by asserting an invalid patent) for its unreasonable litigation tactics.

## II. STATEMENT OF THE ISSUE TO BE DECIDED

Pursuant to Civil L.R. 7-4, the issue to be decided is whether GT's actions in initiating this litigation to assert Patent No. 7,076,445, as well as the manner it litigated this case, make this an "exceptional case" under 35 U.S.C. § 285, thereby justifying an award of reasonable attorney fees to EA as the prevailing party .

## III. STATEMENT OF THE JUDGMENT, STATUTE ENTITLING EA TO THE AWARD, AND THE AMOUNT SOUGHT

Pursuant to Fed. R. Civ. P. 54(d)(2)(B), the judgment and statute entitling EA to an award of attorney fees is this Court's April 25, 2014, Order Granting Motions For Judgment On The Pleadings (Dkt. No. 89) and Judgment (Dkt. No. 90) and 35 U.S.C. § 285. EA seeks the amount identified in the attached Declaration of Jason Lo.

## IV. BACKGROUND FACTS

GT is a subsidiary of Acacia, a large, publicly-traded, and well-known patent assertion entity. *See* Acacia Research Corporation: About Us, http://acaciaresearch.com/about-us/ (last visited June 30, 2014). Acacia claims to be the "industry leader in patent licensing" and touts its "deep legal and technology expertise" to "unlock financial value" in patents. *See id.*

GT itself is a non-practicing entity, *see Gametek LLC v. Electronic Arts Inc.*, No. 12-2927, at *5 (S.D. Cal. July 23, 2013) (Dkt. No. 59), meaning that it has never provided any products to market. *See* (then-Chief Judge of the Federal Circuit) Randall R. Rader, Colleen V. Chien, and David Hricik, Op-Ed., *Make Patent Trolls Pay in Court*, N.Y. Times, June 4, 2013, at A5 (Non-practicing entities' "business plan is simple: trolls (intellectual-property lawyers use less evocative terms like 'non-practicing entities' and 'patent-assertion entities') make money by threatening companies with expensive lawsuits and then using that cudgel, rather than the merits of a case, to extract a financial settlement.") (2013 WLNR 13756999) (Exhibit 1).

All within a span of a few months, Acacia purchased the '445 patent, created GT, assigned the '445 patent to GT, then (through GT) initiated litigation based on the '445 patent. *See* Agreement between Theados Corporation and Acacia Research Group ███████████ (Acacia purchasing the '445 patent) (GAMETEK001405 to GAMETEK001423) (Exhibit 2); Secretary of State Articles of Organization: Gametek LLC (Dec. 14, 2011) (GAMETEK002009 to GAMETEK002010) (Exhibit 3); Assignment and Assumption Agreement between Acacia Research Group and Gametek LLC (Acacia assigning '445 patent to Gametek) ████████████ (GAMETEK002066 to GAMETEK002068) (Exhibit 4). Specifically, Acacia and GT purchased the '445 patent for ███████ and recorded the assignment in February 2012, roughly six years after the patent issued. *See* Agreement between Theados Corporation and Acacia Research Group LLC (GAMETEK001407) (Exhibit 2). To this day, GT's only asset is the '445 patent.

That same month, GT filed a single lawsuit against twenty-two competing mobile game developers, online game developers, and social media providers, including EA, in the Southern District of California, alleging infringement of the '445 patent. *Gametek LLC v. Facebook, Inc.*, No. 12-501 (S.D. Cal. Feb. 28, 2012) (Dkt. No. 1).

The Defendants, including EA, filed a motion to dismiss for improper joinder under 35 U.S.C. § 299. The court *granted* Defendants' motion and dismissed the case. *Gametek LLC v. Facebook, Inc.*, No. 12-501 (S.D. Cal. Dec. 7, 2012) (Dkt. No. 167) (Order Granting Motion to Dismiss under 35 U.S.C. § 299 and Fed. R. Civ. P. 21).

The same day the parties received notice of the dismissal,[2] GT filed a second lawsuit, again in the Southern District, asserting the same '445 patent against EA. *Gametek LLC v. Electronic Arts Inc.*, No. 12-2927 (S.D. Cal. Dec. 10, 2012) (Dkt. No. 1). EA filed a motion to transfer venue to the Northern District. The court *granted* EA's motion. *Gametek LLC v. Electronic Arts Inc.*, No. 12-2927 (S.D. Cal. July 23, 2013) (Dkt. No. 59).

A few months after transfer to the Northern District and with no discovery deadline set, GT

---

[2] Though the Order is dated December 7 and the docket entry currently states the same, the Order was not entered until December 10 and the parties did not receive the ECF notice until that day. *See* Email from ECF to EA's counsel (Dec. 10, 2012 1:28 p.m. PT) (Exhibit 61).

1  filed a motion to compel discovery asserting that a defendant in a related case, Zynga, had been

2  dilatory in producing documents.[3]   In *denying* GT's motion, the court observed GT had made a

3  "fairly significant misrepresentation" to the court.  *See Gametek LLC v. Zynga Inc.*, No. 13-2546

4  (N.D. Cal. Nov. 22, 2013) (Dkt. No. 63), and Transcript of Hearing at 4, *Gametek LLC v. Zynga Inc.*,

5  No. 13-2546 (N.D. Cal. Oct. 21, 2013) (Dkt. No. 92).

6     Shortly after the parties exchanged proposed claim constructions, EA filed a motion for

7  judgment on the pleadings because the '445 patent was invalid under 35 U.S.C. § 101 for lack of

8  patentable subject matter.  At the hearing on April 24, 2014, the Court issued a tentative ruling in

9  favor of granting EA's motion.  The next day, the Court issued an Order granting EA's motion and

10  entering judgment in favor of EA, ending the case.  *See Gametek LLC v. Electronic Arts Inc.*, No. 13-

11  3472 (N.D. Cal. Apr. 25, 2014) (Dkt. No. 89).

12     In granting EA's motion, the Court observed that "this appears to be the *rare* case in which

13  the defendants have met their burden at the pleadings stage to show by clear and convincing evidence

14  that the '445 patent claims an unpatentable abstract idea." *Id.* at *1-2 (emphasis added).  The Court

15  cited the Federal Circuit's holding that "it will be *rare* that a patent infringement suit can be

16  dismissed at the pleading stage for lack of patentable subject matter." *Id.* at *4 (citing *Ultramercial*,

17  722 F.3d at 1338 (emphasis added)).  The Court relied on the fact that, in response to EA's

18  arguments, GT provided "no meaningful alternative," "no substantive counter-argument," and "no

19  explanation" of its position with respect to the Supreme Court's guideposts in the § 101 inquiry.  *Id.*

20     Prior to the Court's invalidation of the '445 patent, GT's litigation campaign against the game

21  industry netted settlement agreements with ten defendants[4] out of the fourteen sued.  Of the five

22  settlement agreements produced by GT to EA in this case, no defendant paid more than ▮▮▮▮▮—

23  far less than a settlement amount reflecting a belief in the strength of a patent and far less than the

24  _____

25  [3]  EA's motion includes references to GT's litigation misconduct against Zynga.  Similarly, Zynga's
     motion includes references to GT's litigation misconduct against EA.  This is to provide the Court
26   with the full picture of GT's patent assertion behavior across an industry as well as because the
     documents supporting the attorney fees overlap due to the joint defense group splitting costs.

27  [4]  All the defendants who settled were non-public companies with fewer litigation resources than
28   EA.  Also see footnote 1.

1  average cost to defend a litigation[5]—yet GT's litigation strategy in the aggregate has earned it

2  ███████ in settlement fees.  *See* Backflip settlement agreement (GT408000368-000375) (Exhibit

3  5); Playforge settlement agreement (GT408000376-000386) (Exhibit 6); 6Waves settlement

4  agreement (GT408000387-000396) (Exhibit 7); NHN settlement agreement (GT408000397-000407)

5  (Exhibit 8); Gameview settlement agreement (GT408000586-000596) (Exhibit 9).  As it stands now,

6  Acacia's settlement fees far exceed the price that it paid for the '445 patent ███████.  *See*

7  Agreement between Theados Corporation and Acacia Research Group LLC (GAMETEK001407)

8  (Exhibit 2).

9  **V.    LEGAL STANDARD**

10      In patent suits, the "court in exceptional cases may award reasonable attorney fees to the

11  prevailing party."   35 U.S.C. § 285.   Until recently, the Federal Circuit had imposed heavy

12  restrictions on what could constitute an exceptional case.  But in April of this year, in *Octane Fitness*,

13  the Supreme Court changed the standard for what constitutes an "exceptional case" under § 285 by

14  rejecting those restrictions.  The Court held there is "one and only one constraint on district courts'

15  discretion to award attorney's fees in patent litigation: The power is reserved for 'exceptional' cases."

16  *Octane*, 134 S. Ct. at 1755-56 ("District courts may determine whether a case is 'exceptional' in the

17  case-by-case exercise of their discretion, considering the totality of the circumstances.").   In other

18  words, the "analysis begins and ends with the text of § 285."  *Id.*

19      The Supreme Court construed "exceptional" in "accordance with its ordinary meaning":

20  "*rare*."  *Id.* (emphasis added).  "In 1952, when Congress used the word in § 285 (and today, for that

21  matter), exceptional meant uncommon, ***rare***, or not ordinary."  *Id.* (emphasis added; quotation marks

22  omitted).  The Court held that an exceptional case "is simply one that stands out from others with

23

24  _____

25  [5]   The median cost to defend a patent infringement suit against a non-practicing entity is $2 million.
    *See* American Intellectual Property Law Association, *Report of the Economic Survey 2013*, at 35

26  (Exhibit 10).  As support for the accuracy of this number, to-date the fees and costs to EA are
    nearly $700,000 (a lower number than sought in this motion, which does not include, *e.g.*, expert

27  fees) even though this case was only in its infancy when the Court entered judgment against GT:
    only partial claim construction briefing and no claim construction hearing, no final expert reports,

28  and no trial.  EA's high cost of defense is unsurprising, given the aggressive and unreasonable
    litigation tactics GT utilized to drive up costs.

respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.*

In explaining the new standard, the Supreme Court rejected the Federal Circuit's prior restrictions as "overly rigid." *Id.* For example, the Federal Circuit's requirement of "material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions" actually rose to the level of independently sanctionable conduct. *Id.* at 1754. But, as § 285 cannot be superfluous to other fee-shifting provisions, the Supreme Court held that § 285 must cover conduct that would *not* otherwise rise to independently sanctionable conduct—such as under Rule 11 or the courts' inherent power to deal with "willful disobedience of a court order or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 1758.

Another test the Supreme Court rejected as "too restrictive" was the Federal Circuit's two-part test requiring the litigation be *both* objectively baseless *and* brought in subjective bad faith. *Id.* at 1757. The Court stated § 285 could cover, for instance, scenarios with only one of those two parts: the scenario where the litigation is objectively baseless (but *not* brought in subjective bad faith) and the scenario where the litigation is brought in subjective bad faith (but *not* objectively baseless). *Id.*

Last, the Supreme Court rejected the Federal Circuit's imposition of a "clear and convincing evidence" standard of proof for § 285. The statute only recites a "simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one." *Id.* at 1758.

The Supreme Court's ruling in *Octane Fitness* is consistent with the view that § 285 is a tool to correct the damage caused by non-practicing entities that plague the court system and productive businesses. As explained by Chief Judge Rader, the "onslaught of litigation" brought by non-practicing entities has "slowed the development of new products, increased costs for businesses and consumers, and clogged our judicial system." *See* Rader et al., *supra*. And generally the judicial system provides a strategic advantage for such companies that do not make any products, because they need not fear a patent infringement counterclaim, need not be concerned with their employees being distracted from a core business of making products, and "when they lose a case, after all, they

are typically out little more than their own court-filing fees." *Id.*

But § 285 provides a remedy: "Section 285 of the Patent Act, as well as Rule 11 of the Federal Rules of Civil Procedure, give judges the authority they need to shift the cost burden of litigation abuse from the defendant to the troll." *Id.*; *see also Network Prot. Servs. v. Fortinet*, No. 12-1106, 2013 WL 4479336, at *1 (N.D. Cal. 2013) (quoting same). By looking for signs "that a patent lawsuit was pursued primarily to take improper advantage of a defendant—that is, using the threat of litigation cost, rather than the merits of a claim, to bully a defendant into settling," judges have "the authority to stop it." *See* Rader et al., *supra.* Chief Judge Rader ended with the following exhortation: "We urge them to do so." *Id.*

In one of the first decisions awarding § 285 fees following *Octane Fitness*, the court in the Southern District of New York embraced its role in deterring patent troll litigation and deemed such an action the "prototypical exceptional case." *Lumen View Tech. v. Findthebest.com*, No. 13-3599, 2014 WL 2440867, at *1, 7 (S.D.N.Y. May 30, 2014). The plaintiff in *Lumen*, a "patent holding non practicing entity that acquires patents and instigates patent infringement lawsuits" and that "appears to be a shell company that is one of a number of related companies involved in litigating patent infringement suits," asserted a computer-implemented method patent. *Id.* The court invalidated the patent under 35 U.S.C. § 101 as an abstract idea. *Id.* at *2.

The court then granted the motion for attorney fees under § 285 because, among other things:

> Lumen's motivation in this litigation was to extract a nuisance settlement from FTB on the theory that FTB would rather pay an unjustified license fee than bear the costs of the threatened expensive litigation. Lumen never sought to enjoin FTB from the allegedly infringing conduct in its prayer for relief. Lumen's threats of "full-scale litigation," "protracted discovery," and a settlement demand escalator should FTB file responsive papers, were aimed at convincing FTB that a pay-off was the lesser injustice.

*Id.* at *6.

The court in *Lumen* held that *Octane Fitness* supported an exceptional case finding because of the importance of deterring such predatory suits: "Lumen's instigation of baseless litigation is not isolated to this instance but is instead part of a predatory strategy aimed at reaping financial advantage from the inability or unwillingness of defendants to engage in litigation against even frivolous patent lawsuits." *Id.* at *7. The court cited as evidence the number of substantially similar

lawsuits the plaintiff had filed within a short time frame, the boilerplate nature of the complaints, and the absence of reasonable pre-suit investigation. *Id.* "The need to advance considerations of deterrence of this type of litigation behavior is evident." *Id.*

## VI.   ARGUMENT

### 1.   EA is the Prevailing Party

This Court's April 25, 2014, Order Granting Motions For Judgment On The Pleadings (Dkt. No. 89) and Judgment (Dkt. No. 90) make EA the prevailing party in this case.  GT recovered none of the relief sought in its complaint against EA.  During the meet and confer for this motion, GT's counsel stated it does not dispute that EA is the prevailing party.  Jason Lo Declaration, ¶ 2.

### 2.   This is an Exceptional Case Under 35 U.S.C. § 285

This case meets the definition of "exceptional" under § 285.  A judgment on the pleadings invalidating a patent based on lack of patentable subject matter is itself rare and justifies an exceptional case finding, particularly here where GT had no substantive response to EA's motion.  In addition, GT has litigated in an unreasonable manner to coerce settlements irrespective of the merits of its case, confirming this case is not common.

Despite its patent being ruled invalid, GT and its parent company Acacia have nevertheless had a successful litigation campaign against the game industry.  Based on the five settlement agreements produced by GT in this case, GT has profited ███████ more than it paid for the '445 patent.  Without a § 285 ruling against it, GT (Acacia) is not the "prevailing party" only in legal terms, not financially, as it has reaped a handsome profit from its business strategy of burdening productive companies, like EA, with a cheap (and invalid) patent combined with unreasonable litigation demands.

Section 285 is the tool to stop such harmful behavior.  EA merely seeks reimbursement for its attorney fees in defending against a lawsuit that should not have been brought at all and was unreasonably litigated by GT to extract an unwarranted settlement.  The remedial purpose of § 285 is to compensate EA as the prevailing party for fees incurred.

1

             **a.**      **GT's assertion of the validity of the '445 patent lacked substantive**

2

                     **strength, as shown by this Court invalidating the patent at the pleading**

3

                     **stage, a rare occurrence that satisfies the "exceptional case" standard**

4

       As the Federal Circuit recently held, invalidating a patent at the pleading stage for lack of

5

patentable subject matter is a "***rare***" occurrence.  *Ultramercial*, 722 F.3d at 1338 (emphasis added).

6

       In granting EA's motion in that same scenario, this Court echoed that sentiment: "this appears

7

to be the ***rare*** case in which the defendants have met their burden at the pleadings stage to show by

8

clear and convincing evidence that the '445 patent claims an unpatentable abstract idea."  *See*

9

*Gametek LLC v. Electronic Arts Inc.*, No. 13-3472, at *1, *4 (N.D. Cal. Apr. 25, 2014) (Dkt. No. 89)

10

(citing *Ultramercial*, 722 F.3d at 1338) (emphasis added).[6]

11

       Further, GT had two opportunities—in its opposition brief and at the hearing—to answer the

12

fundamental § 101 inquiry: what meaningful limitations exist in the claims in addition to the abstract

13

idea?  The Court considered those arguments and rejected every one in its detailed Order.  In doing

14

so, this Court noted GT's lack of substantive responses to the § 101 analysis.  *See id.* at *6, *7, *9,

15

*10 (stating that GT provided "no meaningful alternative," "no substantive counter-argument," and

16

"no explanation" as to its position regarding the § 101 inquiry).

17

       In short, this is a "rare" case and, by definition, it is exceptional under § 285.  *See Octane*

18

*Fitness*, 134 S. Ct. at 1756 ("In 1952, when Congress used the word in § 285 (and today, for that

19

matter), exceptional meant uncommon, ***rare***, or not ordinary." (emphasis added)).

20

             **b.**      **GT litigated this case in an unreasonable and oppressive manner,**

21

                     **providing another ground for an exceptional case finding**

22

       This case is "exceptional" under § 285 for another, independent reason: GT litigated in an

23

unreasonable and oppressive manner, as shown by GT's blatant misjoinder of multiple defendants, its

24

subsequent re-filing in an improper venue, and its filing of a meritless motion to compel.

25

26

27

28

       [6] The Supreme Court's unanimous decision in *Alice Corporation Pty. v. CLS Bank International*, No. 13-298 (June 19, 2014), recently confirmed that this Court's decision is correct.

Gibson, Dunn &
Crutcher LLP

**1)**     **GT violated the joinder statute, and the court granted EA's motion to dismiss for misjoinder**

The joinder statute for patent cases, 35 U.S.C. § 299, is straightforward: "accused infringers may not be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, based solely on allegations that they each have infringed the patent or patents in suit." Yet, GT originally filed its lawsuit alleging the sole '445 patent against twenty-two competing mobile game developers, online game developers, and social media providers, and more than a dozen different accused products.

GT's stated basis for joining all Defendants in a single suit was Facebook's purported involvement in all of the accused products. *See Gametek LLC v. Facebook, Inc.*, No. 12-501 (S.D. Cal. Feb. 28, 2012), ¶ 17. But that allegation had no basis in reality, as shown by (1) the lack of facts supporting it in the Complaint, *id.*, (2) the fact that GT did not even file an opposition to Facebook's motion to dismiss, *id.* at Dkt. No. 120 (GT Response to Facebook Motion to Dismiss), and (3) GT's dismissal of Facebook from the case, *id.* at Dkt. No. 119 (GT Notice of Voluntary Dismissal of Facebook). Moreover, Defendants explained to GT on multiple occasions that GT's suit improperly joined Defendants in contravention of the joinder statute, but GT chose to ignore the statute's requirements and press forward. *See, e.g.*, *id.* at Dkt. No. 51 (Answer, ¶ 17); Email from EA's counsel to GT's counsel (Apr. 30, 2012, 3:00 p.m. PT) (Exhibit 11); Email from EA's counsel to GT's counsel (May 2, 2012, 11:23 a.m. PT) (Exhibit 12); Email from GT's counsel to EA's counsel (May 3, 2012, 8:12 a.m. PT) (Exhibit 13).

As expected, the court in the Southern District dismissed GT's case because of misjoinder, *Gametek LLC v. Facebook, Inc.*, No. 12-501 (S.D. Cal. Dec. 7, 2012), at Dkt. No. 167 (Order Granting Motion to Dismiss under 35 U.S.C. § 299 and Fed. R. Civ. P. 21), but not before EA, among other Defendants, was forced to incur unnecessary attorney fees and costs in researching and drafting a motion to dismiss.[7]

---

[7] EA does not seek fees incurred related to GT's misjoinder, because it occurred in the original, dismissed case. These facts are provided only to reveal the full story of GT's litigation misconduct.

2)      **GT re-filed suit in the same venue, and the court not long after granted EA's motion to transfer venue**

After having its case dismissed because of misjoinder, GT immediately filed separate complaints against the same Defendants in the same venue (again, the Southern District of California).  Ignoring whether each Defendant (or even GT itself) actually had ties to the Southern District, GT forced each Defendant to move to transfer venue.  Indeed, almost all Defendants were similarly situated with no meaningful connections to the Southern District and successfully moved to transfer venue.

Facts either publicly-available or known to GT showed that few Defendants had sufficient ties to the Southern District.  For example, in granting EA's motion to transfer, the court observed that neither GT nor the attorneys who prosecuted the '445 patent nor the alleged inventor of the '445 patent reside in the Southern District—all facts within GT's knowledge when it chose to file suit in the Southern District.  *See Gametek LLC v. Electronic Arts Inc.*, No. 12-2927, at *3 (S.D. Cal. July 23, 2013) (Dkt. No. 59).  As to EA specifically, publicly-available facts (to which GT had access and either knew or should have known) show that EA has *no* operations in or ties to the Southern District. *See id.*

Moreover, even when the court started granting Defendants' motions to transfer one-after-another, GT refused to reconsider its position.  For example, GT argued that each Defendant delayed filing its motion to transfer for almost a year.  The court rejected that argument (repeatedly) because (1) GT improperly used the original filing date of the misjoined case, from which Defendants were dismissed, and (2) GT is a non-practicing entity and thus would not lose sales during the pendency of the actions.  *See, e.g.*, *Gametek LLC v. RockYou, Inc.*, No. 12-2936, at *4 (S.D. Cal. Mar. 12, 2013) (Dkt. No. 26-1); *Gametek LLC v. Zynga Inc.*, No. 12-2933, at *6-7 (S.D. Cal. June 3, 2013) (Dkt. No. 42-1); *Gametek LLC v. Funzio, Inc.*, No. 12-2928, at *6 (S.D. Cal. June 28, 2013) (Dkt. No. 42); *Gametek LLC v. Electronic Arts*, No. 12-2927, at *6 (S.D. Cal. July 23, 2013) (Dkt. No. 59).

GT also argued venue was proper in the Southern District because all of its documents are in the *Central* District and the majority of documents from both sides would be exchanged electronically.  Again, the court repeatedly rejected that argument because (1) GT filed its suit in the

Southern District not the Central District, (2) GT is a non-practicing entity and is unlikely to have a large number of documents to produce, (3) the center of gravity of the dispute is where the defendant is located, and (4) the prevalence of electronic documents meant GT also would have no additional burden if the case were transferred.  *See, e.g.*, *Gametek LLC v. Gameview Studios, LLC,* No. 12-499, at *4 (S.D. Cal. Dec. 4, 2012) (Dkt. No. 47); *Gametek LLC v. RockYou, Inc.*, No. 12-2936, at *4-5 (S.D. Cal. Mar. 12, 2013) (Dkt. No. 26-1); *Gametek LLC v. Zynga Inc.*, No. 12-2933, at *5-6 (S.D. Cal. June 3, 2013) (Dkt. No. 42-1); *Gametek LLC v. Funzio, Inc.*, No. 12-2928, at *5 (S.D. Cal. June 28, 2013) (Dkt. No. 42); *Gametek LLC v. Electronic Arts*, No. 12-2927, at *5-6 (S.D. Cal. July 23, 2013) (Dkt. No. 59); *Gametek LLC v. Crowdstar International Limited*, No. 12-2931, at *5-6 (S.D. Cal. July 25, 2013) (Dkt. No. 32).

By the second time—and certainly by the seventh time—the court rejected GT's arguments, GT knew its arguments were losers but pressed on in any event, thereby needlessly increasing the attorney fees and costs incurred by Defendants and the burden on the court.

> **3)   In at least twenty-five different instances, GT threatened motions to compel and sanctions for alleged discovery violations despite the lack of any discovery deadline, and the court denied GT's motion to compel discovery**

GT's actions required EA, among other Defendants, to incur costs and attorney fees in defending against discovery demands such as a motion to compel, including time spent meeting-and-conferring with GT's counsel, drafting an opposition to GT's motion, and attending the hearing to oppose GT's motion.  Those costs and attorney fees should be reimbursed by GT.

Over the course of the litigation, GT threatened a motion to compel in at least twenty-five emails and with respect to at least twelve different discovery categories.  *See* Email (Nov. 14, 2012 1:00 p.m. PT) (Exhibit 14); Email (Nov. 15, 2012 7:58 a.m. PT) (Exhibit 15); Email (Nov. 23, 2012 10:20 a.m. PT) (Exhibit 16); Email (Nov. 27, 2012 3:07 p.m. PT) (Exhibit 17); Email (Feb. 15, 2013, 3:38 p.m. PT) (Exhibit 18); Email (Feb. 18, 2013, 11:31 p.m. PT) (Exhibit 19); Email (Feb. 20, 2013, 10:00 a.m. PT) (Exhibit 20); Email (Apr. 10, 2013, 5:30 p.m. PT) (Exhibit 21); Email (Apr. 10, 2013, 8:51 p.m. PT) (Exhibit 22); Email (May 21, 2013 11:00 a.m. PT) (Exhibit 23); Email (May 29, 2013,

7:24 p.m. PT) (Exhibit 24); Email (May 31, 2013 2:16 p.m. PT) (Exhibit 25); Email (July 1, 2013 3:15 p.m. PT) (Exhibit 26); Email (Aug. 3, 2013 8:22 a.m. PT) (Exhibit 27); Email (Aug. 5, 2013 7:42 a.m. PT) (Exhibit 28); Email (Sep. 19, 2013 11:54 a.m. PT) (Exhibit 29); Email (Sep. 22, 2013 8:20 p.m. PT) (Exhibit 30); Email (Sep. 24, 2013 7:38 p.m. PT) (Exhibit 31); Email (Oct. 18, 2013 3:02 p.m. PT) (Exhibit 32); Email (Oct. 30, 2013 4:17 p.m. PT) (Exhibit 33); Email (Nov. 5, 2013 1:37 p.m. PT) (Exhibit 34); Email (Nov. 13, 2013 8:36 p.m. PT) (Exhibit 35); Email (Mar. 22, 2014 3:57 p.m. PT) (Exhibit 36); Email (Mar. 26, 2014 11:03 a.m. PT) (Exhibit 37); Email (Apr. 11, 2014 5:29 p.m. PT) (Exhibit 38).

GT even threatened to seek sanctions against EA.  *See* Email from GT's counsel to EA's counsel (Aug. 5, 2013 7:42 a.m. PT) (Exhibit 28); *see also* Email from GT's counsel to Zynga's counsel (Apr. 11, 2014 5:29 p.m. PT) (Exhibit 38) (This occurred after both parties had filed their motion for judgment on the pleadings papers.).  When GT ultimately filed a motion to compel, against Zynga, which motion presumably presented its strongest case among its multitude of specious demands, the court not only rejected GT's motion but observed that GT made a "*fairly significant misrepresentation*" to the court.  *See Gametek LLC v. Zynga Inc.*, No. 13-2546 (N.D. Cal. Nov. 22, 2013) (Dkt. No. 63) and Transcript of Hearing at 4, *Gametek LLC v. Zynga Inc.*, No. 13-2546 (N.D. Cal. Oct. 21, 2013) (Dkt. No. 92) (emphasis added).

As explained in the Order, GT's motion claimed Zynga was dilatory, but there had not yet been a discovery deadline set, Zynga had already produced the majority of its core documents, and Zynga had already agreed to produce the documents at issue.  Specifically, the court held (1) Zynga had appropriately phased the production of documents by prioritizing those that are relevant to the core issues of alleged infringement and damages (Zynga had already made available for inspection all source code for the twenty accused games and produced all requested financial information for the nineteen original games, and Zynga planned on producing the financial information for the final game within a week), (2) Zynga's representations regarding further search and production efforts are reasonable (Zynga was already collecting and planned on producing documents for the two remaining categories of documents on a rolling basis as they become available), and (3) the *Markman* hearing was not scheduled to take place for over half a year and the court had yet to set a discovery cut-off

date.  *See id.*  There was no reason for GT's unnecessary discovery demands.

Further, after the court's denial of GT's motion to compel, GT continued its unreasonable litigation demands.  It served EA with a convoluted list of seventy-four 30(b)(6) topics on nine accused products.  *See* Plaintiff's Rule 30(b)(6) Notice to EA (Exhibit 39).  Similarly, GT served on Zynga a list of seventy-three 30(b)(6) topics on twenty accused products.  Despite having Zynga's financial information showing the relative success of each accused product, GT refused to prioritize the accused products or drop any from the case, even though it could never litigate to trial such a large number of accused products.  *See* Email chain from GT's counsel to Zynga's counsel (Apr. 16, 2014, 11:37 a.m. PT), Zynga's counsel to GT's counsel (Apr. 14, 2014, 5:46 p.m. PT), and GT's counsel to Zynga's counsel (Apr. 11, 2014, 5:29 p.m. PT) (Exhibit 40).  And while Zynga would have likely needed to offer forty-two deponents to cover the seventy-three topics (two witnesses per accused product plus one financial person), GT continued its demands and sought a continuous, open deposition that would continue indefinitely.  At this point, there was still no discovery deadline set.

Even after this Court's tentative ruling on the merits in favor of EA's motion for judgment on the pleadings to end the case entirely, within hours of the hearing GT reiterated its demand for EA to present all witnesses for deposition with no change in schedule and even sought to add an additional accused product.  Specifically, at the end of the hearing, GT's counsel seemed to acknowledge that it would not make sense to go forward with depositions, in light of the Court's tentative ruling, and he did not want to waste anyone's time.  This of course is the most reasonable conclusion.  However, consistent with the way it had litigated the case from day one, GT sent emails the next day pressing for discovery at full-steam:

• The morning after the hearing, at 9:02 a.m., GT gave notice to EA of its intent to take its Rule 30(b)(6) depositions (again, on seventy-four topics covering nine accused products) no later than June 25, 2014.

• At the same time, GT's counsel gave notice of its intent to add a new accused product to the case against defendant Zynga.

• About one hour later, GT's counsel gave notice of its intent to continue with several scheduled depositions and also demanded to depose dozens of additional Zynga employees on

the remaining accused games and topics, all before May 12, 2014.  In other words, *after* the Court gave a tentative ruling invalidating the patent (and no indication to the contrary), GT demanded expedited depositions of Zynga's witnesses on seventy-three Rule 30(b)(6) topics on twenty accused products, all to occur within three weeks.

*See* Email from GT's counsel to Zynga's counsel (Apr. 25, 2014, 8:17 a.m. PT) (Exhibit 41); Email from GT's counsel to EA's counsel (Apr. 25, 2014, 9:02 a.m. PT) (Exhibit 42); Email from GT's counsel to Zynga's counsel (Apr. 25, 2014, 9:19 a.m. PT) (Exhibit 43).

In short, this is a prime example of a "sign that a patent lawsuit was pursued primarily to take improper advantage of a defendant—that is, using the threat of litigation cost, rather than the merits of a claim."  *See* Rader et al., *supra*.  As it had a tentative ruling against the merits of its claim, GT's actions did not reflect zealous advocacy.  Rather, without any regard for the merits of its claim, GT sought merely to increase EA's costs.

## VII.   CONCLUSION

For the foregoing reasons, and based on the totality of the circumstances, EA respectfully requests that the Court exercise its discretion to find this case "exceptional" and award EA's attorney fees in accordance with § 285.  Without such a ruling, GT (Acacia) will profit from its unreasonable litigation conduct in this case and will be incentivized to continue its (winning) formula in future litigation campaigns.

Dated:  June 30, 2014                         Respectfully submitted,

                                              JASON LO
                                              GIBSON, DUNN & CRUTCHER LLP

                                              By:  /s/ Jason Lo

                                              Attorneys for Defendant Electronic Arts Inc.

Gibson, Dunn & Crutcher LLP